+
# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE

HYC LOGISTICS, INC.,

    Plaintiff,

vs.

LOUISE PARIS LTD., JOSEPH BARNATHAN, SOLOMON BARNATHAN, and ABRAHAM BARNATHAN

    Defendants.

Civil Action No. _____

## VERIFIED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

    **COMES NOW**, the Plaintiff, HYC Logistics, Inc. ("HYC"), by and through undersigned counsel, and files this Verified Complaint for Damages and Declaratory Relief against Defendants, Louise Paris, Ltd. ("LP"), Joseph Barnathan ("J. Barnathan"), Solomon Barnathan ("S. Barnathan"), and Abraham Barnathan ("A. Barnathan") (collectively herein, the "Defendants" or a "Defendant"). Now, for causes of action against the Defendants, jointly and severally, HYC would state and allege as follows:

### PARTIES

    1.    Plaintiff, HYC Logistics, Inc., is a for-profit corporation chartered under the laws of the State of Tennessee, and with a principal place of business in Memphis, Tennessee.

    2.    Defendant, Louise Paris, Ltd., is a corporation organized under the laws of the State of New York, and with a principal place of business located at 1407 Broadway, Suite 1405, New York, New York 10018. LP does not currently list its registered agent for service of process with

1

the New York Secretary of State Division of Corporations, and service may be accomplished on LP in any manner, and at any place, prescribed by law.

3. Defendant, Joseph Barnathan, is an adult resident and citizen of the State of New York who, upon information and belief, can be served with process at 1407 Broadway, Suite 1405, New York, New York 10018.

4. Defendant, Solomon Barnathan, is an adult resident and citizen of the State of New York who, upon information and belief, can be served with process at 1407 Broadway, Suite 1405, New York, New York 10018.

5. Defendant, Abraham Barnathan, is an adult resident and citizen of the State of New York who, upon information and belief, can be served with process at 1407 Broadway, Suite 1405, New York, New York 10018.

## JURISDICTION AND VENUE

6. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as the parties are completely diverse and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 as a substantial part of the events or omission giving rise to HYC's claims occurred in this judicial district and because the Defendants are subject to the Court's personal jurisdiction with respect to this action.

8. Personal jurisdiction is proper as, *inter alia*, certain of the operative contracts contain a forum selection clause and/or consent to personal jurisdiction. Moreover, personal jurisdiction is proper pursuant to the Tennessee long-arm statute and the Due Process Clause of the Fourteenth Amendment to the United States Constitution as Defendants, among other things, conducted business within the State of Tennessee, purposely availed themselves of the laws of the

State of Tennessee, entered into a service contract and indemnity and/or guaranty agreement covering a person, property, and/or risk located within this State at the time of contracting, and/or engaged in a tortious act or omission or other unlawful conduct within this State.

## FACTS

9. Since 1948, HYC has been a respected provider of freight forwarding and customs broker services.

10. HYC offers international freight and brokerage service, customs clearance, and trucking services to a diverse group of clients in dozens of different commercial sectors, including end-state retailers – both brick and mortar and Amazon™ and other e-sellers.

11. A large cross-section of HYC's business caters to clients needing both import and export services.

12. HYC offers U.S. Customs clearance services and operates a license U.S. Customs brokerage department.

13. For customers requiring import and Customs clearance, HYC provides end-to-end services – particularly from China.

14. This includes, but is not limited to, securing cargo containers, securing transport of the cargo containers by an international shipping concern, receiving the cargo at a U.S. port, clearing customs, and then either storing or transporting the goods by ground transport to either the client or a destination provided by the client.

15. Some clients require the full panoply of import services, while others require only assistance with the U.S.-side tasks (i.e., Customs clearance, storage, and shipping).

16. For customers requiring import services, HYC contracts with its clients using the standard Terms and Conditions of Service promulgated by the National Customs Brokers &

Forwarders Association of America, Inc. (the "NCBFAA") – which are standard in the freight forwarding and customs brokerage industry.

17. In or about November 2022, LP contacted HYC about providing freight forwarding and customs brokerage services relative to particular goods LP planned to purchase and transport from a manufacturer in China.

18. To that end, LP entered into a NCBFAA Terms and Conditions of Service with HYC dated November 15, 2022 (hereafter, the "Contract").[1]

19. Under the Contract, HYC provided services to LP on account which LP agreed to promptly pay upon receipt of HYC's monthly invoice.

20. The Contract further provided that any disputes between the parties that might arise under the Contract are to be brought - by agreement of the parties – in a court of record located within the State of Tennessee.

21. The Contract was signed by Defendant J. Barnathan on behalf of LP.

22. Upon information and belief, the Barnathan Defendants are the majority, if not exclusive, owners of LP and both control and operate LP.

23. Each of the Barnathan Defendants is an officer, director, or executive with LP.

24. According to the New York Secretary of State Division of Corporations, S. Barnathan purports to be LP's Chief Executive Officer.

25. Likewise, J. Barnathan purports to be LP's Vice President.

26. The Barnathan Defendants each derive a substantial and direct financial benefit from LP's business operations.

27. HYC began providing freight services to LP under the Contract.

---

[1] A copy of the Contract is attached hereto as Exhibit "A," and incorporated herein by reference.

28. LP would order goods from a Chinese manufacturer and HYC would coordinate the transport of the containers from China to the U.S. Upon arrival in the U.S. Port, the Bills of Lading would be released to HYC - evidencing that LP had paid the manufacturer in full - and HYC would transport the containers with the goods to LP's designated warehouse.

29. In or about December 2022, HYC learned that LP had not fully paid the manufacturer for the some of the containers HYC was importing and transporting and that the manufacturer would not release to HYC the Bills of Lading.

30. LP assured HYC that it had worked out payment arrangements with the manufacturers and that HYC could release the goods to LP even without the released Bills of Lading.

31. In an effort to induce HYC into delivering the containers to LP without the released Bills of Lading, LP entered into an Indemnity Agreement with HYC wherein LP agreed to fully indemnify and reimburse HYC for any and all damages, fees, and/or costs, associated with HYC releasing the goods to LP without receipt of the Bills of Lading (hereafter, the "Indemnity").[2]

32. For the next twelve months, LP continued to use HYC for its importing and transporting without any real issues.

33. In December 2023, LP hired HYC to handle the transport of manufactured goods LP ordered from Detail Fashion Ltd. ("Detail Fashion"), a Chinese textile manufacturer located in Tianjin, China.

34. The goods manufactured for LP by Detail Fashion were loaded at the port in Shanghai for the trans-Pacific cargo container voyage to the port of Los Angeles.

---

[2] A copy of the Indemnity is attached hereto as Exhibit B," and incorporated herein by reference.

35. To facilitate the export from China, HYC hired a local company in China, HECNY Group ("HECNY"), to receive the goods from Detail Fashion, deliver the goods to the port in Shanghai, load the goods on to a container ship, and transport the goods to Los Angeles.

36. Upon arriving in Los Angeles, HYC would then directly handle the U.S.-side of the transaction and deliver the containers via ground transport to LP.

37. When the goods arrived at the port of Los Angeles, HYC learned that LP had not paid Detail Fashion in full and that Detail Fashion had not released the Bills of Lading.

38. LP demanded that the goods be released.

39. In direct reliance on LP's assurances in the Indemnity, HYC released the goods to LP.

40. Upon information and belief, LP failed to pay Detail Fashion $791,000.90 for the goods.

41. As a result of LP's non-payment, Detail Fashion sued HECNY in a Chinese court, alleging that it should not have released the goods and freezing RMB $5,000,000.00 (approximately $700,000.00 USD) of HECNY's funds to secure the unpaid balance owed by LP for the goods.

42. LP knew that Detail Fashion sued HECNY in a Chinese court and that the Chinese Court froze HECNY's assets, but LP refused to take any action to resolve the matter.

43. Instead, LP continued selling the goods and retaining the profits.

44. In response to the legal action taken by Detail Fashion resulting from LP's non-payment, HECNY took action against HYC.

45. HECNY held in port and/or suspended delivery of HYC's *other* customers' containers in route from China.

46. HECNY threatened legal action against HYC.

47. And HECNY sought to terminate its business relationship with HYC.

48. HECNY's actions against HYC were the direct and proximate result of LP's non-payment to Detail Fashion and LP's violation of both the Contract and Indemnity.

49. HYC communicated directly with LP to try and resolve the dispute, but LP refused to make the required payment.

50. HYC also communicated directly with Detail Fashion to try and resolve the litigation with HECNY and obtain the release of HECNY's frozen funds.

51. Detail Fashion agreed to withdraw the case pending in the Chinese Court and release HECNY's frozen funds —and HECNY agreed to ensure the delivery HYC's *other* customers' containers and forgo further legal action— if HYC agreed to pay (1) LP's outstanding invoice(s) due to Detail Fashion and (2) Detail Fashion's other related costs incurred including legal fees incurred.

52. HECNY likewise demanded that HYC pay its legal fees and costs associated with the Chinese litigation in exchange for its agreement to release for delivery HYC's *other* customers' containers and forgo further legal action against HYC.

53. On several occasions, HYC communicated with LP and demanded that LP pay the money it owed to Detail Fashion and honor its obligations under the Contract and Indemnity.

54. LP consistently failed and refused.

55. LP —by and through the Barnathan Defendants— represented to HYC that LP was not in a financial position to satisfy the debt outright. LP claimed it would need to sell the goods, first, and then reimburse HYC for all of the associated expenses.

56. Indeed, LP appears to have a history —including a recent history— of non-payment delinquencies involving import-related creditors.

57. For instance, in August 2023, Shaoxing Chenyee Textile Co. Ltd., a Chinese textile manufacturer, filed suit against LP in the United States District Court for the Southern District of New York seeking nearly $2 Million for unpaid invoices regarding goods which LP ordered, imported to the United States, and accepted – during the same period of time at issue here. *See Shaoxing Chenyee Textile Co. Ltd. v. Louise Paris Ltd*., Case No. 1:23-cv-06755-GHW, (S.D.N.Y. Aug. 2, 2023), D.E. 1 (Complaint).

58. Similarly, at about the same time, an Indian garment manufacturer sued LP on open invoices regarding goods which LP ordered, imported to the United States, and accepted. In this case, however, though LP purported to pay parts of the outstanding balance owed, the checks — each of them signed by S. Barnathan— allegedly bounced. *See Bhavika Apparels Pvt. Ltd. v. Louise Paris, Ltd*., Case No. 1:23-cv-06177-JSR, (S.D.N.Y. July 18, 2023), D.E. 1 (Complaint).

59. Legal threats continued to mount against HYC from both HECNY and HYC's own customer base whose containers were being held by HECNY in port.

60. Detail Fashion was owed $791,009.90 for the cost of goods sold to LP plus $23,812.00 in legal fees.

61. HECNY was demanding release of its frozen funds, plus $20,607.72 in legal fees.

62. And LP was delinquent in paying HYC the money it was owed in the amount of $447,288.28 for services under the Contract plus demurrage charges.[3]

---

[3] Demurrage is a charge raised when a full container is not moved out of the port/terminal for unpacking within the allowed free days offered by the shipping line. The charge is levied by the shipping line to the importer – in this case, HYC.

63. Because HECNY was holding in port and/or suspending delivery of HYC's *other* customers' containers in route from China, HYC's customers began terminating HYC and using other carriers.

64. HYC suffered substantial financial loss and damages.

65. HYC further suffered substantial damage to its business reputation in the marketplace.

66. In an effort to save HYC from total collapse, HYC was forced to take a loan from its bank and use the loaned money to pay off the debt obligations owed by LP to Detail Fashion and HECNY.

67. HYC paid Detail Fashion $791,009.90 to resolve LP's debt. [4]

68. Thus, as of this date, LP is indebted to HYC in the amount of $927,589.16 or sums paid on LP's behalf —and to LP's express benefit— as well as LP's underlying debt to HYC for the services HYC provided in the first place, and for which LP has likewise not paid.

69. LP owes HYC for services rendered and expenses incurred under the Contract in the amount of $543,525.40.

70. LP likewise owes HYC for demurrage charges under the Contract in the amount of $25,197.00

71. Crediting all payments, LP owes HYC under the Indemnity for the money it paid to Detail Fashion $384,063.76

72. HYC owes HECNY an additional $25,907.72 in legal fees and expenses which LP is required to pay under the Indemnity.

---

[4] Copies of the Wire Transfer and Confirmation are attached hereto collectively as Exhibit C," and incorporated herein by reference.

73. HYC has demanded full and complete payment in the amount of from LP.[5]

74. On December 26, 2023, J. Barnathan, on behalf of LP, agreed to enter into a Settlement Agreement acknowledging the debt and agreeing to pay HYC, the then remaining sum total of $1,238,288.00, in monthly installments from January 2024 through March 2024.

75. As part of the Settlement Agreement, HYC required, and each of the Barnathan Defendants agreed to be, guarantors for the repayment obligation, jointly and severally.

76. In exchange for LP making the payments proscribed in the Settlement Agreement, HYC agreed to forebear on taking legal action against LP and availing itself of any of its rights or remedies under the Contract, the Indemnity, at law, or otherwise.

77. The agreement between HYC, LP, and the Barnathan Defendants is memorialized in the Settlement Agreement negotiated between the parties.[6]

78. On December 26, 2023, Defendant J. Barnathan held a conference call with HYC and its legal counsel wherein he agreed to liability for the debt, agreed to sign the Settlement Agreement and to timely make the payments required thereunder.

79. On December 29, 2023, Counsel for LP emailed HYC stating that the Settlement Agreement was signed by LP and that LP and the Barnathan Defendants agreed to perform thereunder.

80. On December 28, 2023, Defendants made an initial installment payment under the Settlement Agreement in the amount of $220,000.00.

81. On January 22, 2024, Defendants made an additional installment payment under the Settlement Agreement in the amount of $75,000.00.

---

[5] HYC had made repeated demand on LP to pay the relevant debts throughout the time period relevant; however, once HYC paid the debts itself, HYC redoubled its efforts to obtain reimbursement from LP.
[6] A copy of the Settlement Agreement is attached hereto as Exhibit "D," and incorporated herein by reference.

10

82. On February 20, 2024, Defendants made an additional installment payment under the Settlement Agreement in the amount of $70,000.00.

83. Despite having stated that the Settlement Agreement was signed and despite LP and the Barnathan Defendants partially performing thereunder, Defendants refused to tender ink-signed copies of the Settlement Agreement.

84. Instead, Defendants retained legal counsel who tried to renegotiate the payment terms of Settlement Agreement, post facto.

85. The Defendants have now defaulted under the Settlement Agreement and stopped making timely payments.

86. As of this date, Defendants owe HYC $952,780.16

87. As a direct and proximate result of Defendants' misconduct, HYC has suffered significant financial loss.

88. As a direct and proximate result of Defendants' misconduct, HYC's reputation in the marketplace has been substantially damaged.

## COUNT I:
## BREACH OF CONTRACT

89. HYC incorporates and realleges each of the foregoing paragraphs of this Verified Complaint as if set forth more fully herein verbatim.

90. HYC and LP entered into the Contract and are bound by its terms.

91. HYC and LP entered into the Indemnity and are bound by its terms.

92. HYC, LP, and the Barnathan Defendants entered into the Settlement Agreement and are bound by its terms.

93. Each of the contracts required LP to pay HYC or to otherwise honor LP's debt obligations.

11

94. HYC performed under every relevant contract.

95. LP has failed to perform (or perform fully) under every relevant contract.

96. The Barnathan Defendants failed to perform under the Settlement Agreement.

97. As the legal and proximate result of the Defendants' breaches of the contracts, HYC has been damaged.

98. HYC's damages continue to accrue due to, *inter alia*, accruing interest, possible demurrage, and/or other unknown bills of lading which LP covenanted to provide HYC.

99. Additionally, HYC has been forced to retain legal counsel to resolve LP's breaches of the contracts and have expended significant legal fees to do so.

100. HYC's damages are not restricted merely to HYC's capital outlay on LP's behalf. HYC's ability to do business has been restricted based on the absence of available liquidity, forcing HYC to lose potential business opportunities.

101. LP's actions have damaged HYC's reputation and standing.  The most readily apparent example is HYC's fractured business relationship with HECNY – a trusted business partner in the past.

102. LP's actions have damaged HYC's reputation and standing and HYC has lost customers.

103. HYC asserts and affirmatively makes a claim for punitive damages against the Defendants arising out of their breaches of contract.  Those breaches were done intentionally, fraudulently, maliciously, or recklessly.

104. The Defendants repeatedly made representations to HYC to induce HYC to act to their benefit while knowing that they (the Defendants) had no intention or ability to honor their representations.

## COUNT II:
## FRAUD, FRAUDULENT INDUCEMENT, INTENTIONAL AND/OR NEGLIGENT MISREPRESENTATION

105. HYC incorporates and realleges each of the foregoing paragraphs of this Verified Complaint as if set forth more fully herein verbatim.

106. LP, and the Barnathan Defendants —both individually and collectively— made repeated representations to HYC in order to induce HYC to act.

107. Through both telephone and email, the Defendants represented they were an established business concern with plenty of liquidity to honor their obligations.

108. LP, by and through the Barnathans, represented to HYC that LP had the ability to pay for the services to be rendered under the initial Contract.

109. Of course, LP entered into that Contract at precisely the same time it was delinquent with other service providers and vendors, and during the same time it was in active litigation with other service providers and vendors for precisely the same conduct alleged here.

110. As other contemporaneous lawsuits make clear, LP has a clearly established practice of ordering goods from overseas, arranging their import into the United States, taking delivery of the goods, and then selling the goods while not paying anyone in the commercial chain for the services they provided LP.

111. LP never had any intention of honoring its payment agreement.

112. And after HYC released the goods to LP and paid LP's debts, the Defendants promised they would pay HYC back in full if HYC would forebear on taking legal action – a promise Defendants had no intention of honoring when the promise was made.

113. HYC repeatedly relied on Defendants' false statements and promises, and HYC repeatedly took action based on those same false statements and representations.

13

114. The Defendants' repeated false statements and promises have damaged HYC.

115. HYC asserts and affirmatively makes a claim for punitive damages against the Defendants arising out of their false statements, promises, and misrepresentations.

## COUNT III:
## UNJUST ENRICHMENT AND/OR QUANTUM MERUIT

116. HYC incorporates and realleges each of the foregoing paragraphs of this Verified Complaint as if set forth more fully herein verbatim.

117. Even if there was no valid and enforceable contract covering all amounts owed, HYC is nonetheless entitled to recover against LP under theories sounding in unjust enrichment and/or quantum meruit.

118. HYC paid LP's debts – all of them.

119. HYC released the goods at issue to LP.

120. At all times relevant, LP knew that HYC expected to be paid – not just for the services directly provided by HYC, but also for the debt obligations HYC satisfied on LP's behalf.

121. Not only did LP derive a financial benefit from receiving and selling the goods, it also derived a direct, financial benefit from being released from its own debt obligations and avoiding yet more costly litigation by Detail Fashion and HECNY.

122. Indeed, the Barnathan Defendants likewise reaped the same benefits individually and are thus liable to HYC.

## COUNT IV:
## SWORN ACCOUNT

123. HYC incorporates and realleges each of the foregoing paragraphs of this Verified Complaint as if set forth more fully herein verbatim.

124. HYC provided the Defendants services on an open account basis.

125. Defendants promised and pledged to pay that account, but have failed to do so in full.

126. The amount just and duly owing to HYC from the Defendants as of today is $932,929.79.

## COUNT V:
## DECLARATORY JUDGMENT

127. HYC incorporates and realleges each of the foregoing paragraphs of this Verified Complaint as if set forth more fully herein verbatim.

128. There is a real, concrete dispute between the parties – there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.  28 U.S.C. § 2201.

129. HYC is entitled to a declaration that, *inter alia*, the Defendants have breached the various contracts at issue, and that HYC is justly entitled to recover all sums due and owing from the Defendants.

130. HYC is entitled to a declaration that LP's corporate veil should be pierced so as to assert liability directly against the Barnathan Defendants.  The corporate form is a sham or mere instrumentality, and the Barnathan Defendants have failed to observe all necessary corporate formalities, intermingled funds, and used LP as their own personal piggy bank.

131. HYC is entitled to a declaration that it may exercise any and all lien rights it may have in any of LP's goods still in transit or in HYC's custody or control.

**WHEREFORE**, HYC prays that:

A. Proper process issue and be served upon each Defendant.

B. Each Defendant be required to answer within the time prescribed by law.

  C. The Court further pierce LP's corporate veil and hold the Barnathan Defendants directly liable for LP's conduct as the corporate form is a sham or mere instrumentality.

  D. The Court grant judgment in HYC's favor on all causes of action asserted.

  E. The Court disgorge, freeze, and take custody of any and all profits derived by the Defendants from the shipment and/or goods at issue.

  F. The Court award HYC all compensatory damages to which it may be entitled at law, in contract, in equity, or otherwise.

  G. The Court award HYC punitive damages for Defendants' breaches of contract and/or fraudulent conduct.

  H. The Court find and declare that Defendants are indebted to HYC in an amount to be proven at trial.

  I. The Court award HYC all interest to which it is entitled at law, in contract, in equity, or otherwise.

  J. The Court award HYC its discretionary costs.

  K. The Court award HYC pre- judgment and post-judgment interest at the maximum rates allowable by law.

  L. The Court award HYC all of its reasonable attorneys' fees and costs associated with this action, as well as all such fees and costs provided for by contract.

  M. The Court award HYC such other and further relief to which it may be entitled.

           **GLANKLER BROWN, PLLC**

           By: /s/ S. Joshua Kahane
             S. Joshua Kahane (TN #23726)
           Aubrey B. Greer (TN #35613)
           Yosef Horowitz (TN #36353)
           6000 Poplar Avenue, Suite 400

> Memphis, Tennessee 38119
> Phone : (901) 525-1322
> Fax : (901) 525-2389
> jkahane@glankler.com
> agreer@glankler.com
> jhorowitz@glankler.com

*Attorneys for Plaintiff, HYC Logistics, Inc*

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Uri Silver as President of HYC, declare under penalty of perjury that the foregoing is true and correct.

On behalf of **HYC LOGISTICS, INC**:

By: _____

Name: Uri Silver

Title: President

Date: March 20, 2024