## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| HYC LOGISTICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:24-cv-02191-TLP-atc |
| v. | ) | |
| | ) | |
| LOUISE PARIS, LTD, JOSEPH | ) | |
| BARNATHAN, SOLOMON | ) | |
| BARNATHAN, and ABRAHAM | ) | |
| BARNATHAN, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART THE BARNATHANS' MOTION FOR JUDGMENT ON THE PLEADINGS

In March 2024, Plaintiff HYC Logistics, Inc. ("HYC") sued Joseph Barnathan, Solomon Barnathan, and Louise Paris, LTD ("LP") (collectively "Defendants"). (ECF No. 1.) HYC asserted claims for breach of contract, fraud, fraudulent inducement, intentional misrepresentation, negligent misrepresentation, unjust enrichment, quantum meruit, sworn account, and declaratory judgment. (*Id.*)

Defendants Joseph Barnathan, Solomon Barnathan, and Abraham Barnathan (collectively, the "Barnathans" or the "Individual Defendants") move for judgment on the pleadings. (ECF No. 25.) HYC responds in opposition. (ECF No. 26.) For the reasons explained below, the Court **GRANTS IN PART** and **DENIES IN PART** the Barnathans' Motion.

1

## BACKGROUND

HYC is a logistics company that provides freight forwarding and customs broker services, offering both import and export services. (ECF No. 1 at PageID 3.) And HYC contracts with the clients needing import services by using the Terms and Conditions of Services set forth by the National Customs Brokers & Forwarders Association of America, Inc. ("NCBFAA"). (*Id.* at PageID 3–4.) HYC asserts that these are the standard terms in the industry. (*Id.*)

For clients needing both import and customs clearance services, HYC provides "end-to-end services," particularly for imports coming from China. (*Id.* at PageID 3.) These end-to-end services include "securing cargo containers, securing transport of the cargo containers by an international shipping concern, receiving the cargo at a U.S. port, clearing customs, and then either storing or transporting the goods by ground transport to either the client or a destination provided by the client." (*Id.*)

## I.    LP, the Services Contract, and the Indemnity

HYC provided these types of services to Defendant LP. The Individual Defendants here—Joseph Barnathan, Abraham Barnathan, and Solomon Barnathan—are the "majority, if not exclusive, owners of LP and both control and operate LP." (*Id.* at PageID 4.) Furthermore, each of the Barnathans "is an officer, director, or executive with LP." (*Id.*) Solomon Barnathan is LP's Chief Executive Officer and Joseph Barnathan is LP's Vice President. (*Id.*)

In November 2022, LP contacted HYC to ask about using HYC's services for goods LP planned to buy from a manufacturer in China. (*Id.* at PageID 4.) And on November 15, 2022, HYC and LP executed a contract, the NCBFAA Terms and Conditions of Services ("Services Contract" or "Contract"). (*Id.*) According to the pleadings, the Parties agree that "[t]he Contract

was signed by Defendant J. Barnathan on behalf of LP." (*Id.*; ECF No. 15 at PageID 98.) As HYC explains, "[u]nder the Contract, HYC provided services to LP on account which LP agreed to promptly pay upon receipt of HYC's monthly invoice." (ECF No. 1 at PageID 4.)

And so HYC began to provide services to LP under the Services Contract. (*Id.* at PageID 4.) The business relationship functioned like this: "LP would order goods from a Chinese manufacturer and HYC would coordinate the transport of the containers from China to the U.S. Upon arrival in the U.S. Port, the Bills of Lading would be released to HYC—evidencing that LP had paid the manufacturer in full—and HYC would transport the containers with the goods to LP's designated warehouse." (*Id.* at PageID 5.)

In December 2022, the month after LP and HYC entered into the Services Contract, HYC learned that LP had not paid a Chinese manufacturer in full for some goods HYC was importing and that the manufacturer would not release the Bills of Lading to HYC. (*Id.*) But LP assured HYC that they could release the goods to LP without the Bills of Lading, as LP told HYC that it had worked out payment arrangements. (*Id.*) To convince HYC to release the containers to LP without the Bills of Lading, LP entered into an indemnity agreement with HYC ("Indemnity"). (*Id.*) Under the Indemnity, "LP agreed to fully indemnify and reimburse HYC for any and all damages, fees, and/or costs, associated with HYC releasing the goods to LP without receipt of the Bills of Lading." (*Id.*) For the next twelve months, HYC imported and transported goods for LP without issue. (*Id.*)

## II.    Detail Fashion Ltd.

LP ordered goods from Detail Fashion Ltd. ("Detail Fashion"), a textile manufacturer located in Tianjin, China. (ECF No. 1 at PageID 5.) And in December 2023, LP hired HYC to handle the transport of goods that LP ordered from Detail Fashion. (*Id.*) HYC then hired

3

HECNY Group ("HECNY"), a company in China, to facilitate the export of the goods. (*Id.* at PageID 6.) HECNY's role was "to receive the goods from Detail Fashion, deliver the goods to the port in Shanghai, load the goods onto a container ship, and transport the goods to Los Angeles." (*Id.*) Then, once the containers arrived in the United States, HYC's role was to deliver the goods to LP using ground transportation. (*Id.*)

But, when the goods arrived at the port in Los Angeles, HYC discovered that LP had not fully paid Detail Fashion and "that Detail Fashion had not released the Bill of Lading." (*Id.*) In fact, LP failed to pay Detail Fashion $791,000.91. (*Id.*) Even so, "LP demanded that the goods be released," and HYC released the goods. (*Id.*)

Because LP had not paid Detail Fashion, Detail Fashion sued HECNY in Chinese court and alleged that HECNY should not have released the goods. (*Id.*) The Chinese court then froze around $700,000.00 of HECNY's funds to secure LP's unpaid balance. (*Id.*) In response, HECNY acted against HYC. (*Id.*) In particular, "HECNY held in port and/or suspended delivery of HYC's other customers' containers in route from China." (*Id.*) HECNY also threatened legal action and "sought to terminate its business relationship with HYC." (*Id.*)

HYC set out to resolve its business problems. (*Id.* at PageID 7.) To that end, HYC reached agreements with Detail Fashion and HECNY. (*Id.*) In sum, if HYC agreed to three conditions, then "Detail Fashion agreed to withdraw the case pending in the Chinese Court and release HECNY's frozen funds—and HECNY agreed to ensure the delivery HYC's *other* customers' containers and forgo further legal action." (*Id.*) The three conditions were that HYC had to pay (1) LP's outstanding invoices from Detail Fashion, (2) Detail Fashion's legal fees and other fees incurred, and (3) HECNY's legal fees and costs connected to the litigation in China.

(*Id.*)  The outstanding invoices LP owed Detail Fashion added up to $791,009.90 and Detail

Fashion's legal fees totaled $23,813.00.  (*Id.*)  HECNY's legal fees totaled $20,607.72.  (*Id.*)

## III.    Settlement Agreement

In turn, HYC asked that LP pay Detail Fashion, but LP refused.  (ECF No. 1 at PageID

10.)  Because HECNY was holding HYC's other customers' containers in port, HYC began to

lose clients.  (*Id.* at PageID 9.)  And so, to save itself "from total collapse," HYC took a loan and

paid Detail Fashion $791,009.90 to resolve LP's debt to Detail Fashion.  (*Id.*)  The Complaint

does not specify when HYC paid this money to Detail Fashion.  But HYC attached

documentation of the wire transfer to the Complaint, which shows that December 28, 2023, was

the "entry date" and December 29, 2023, was the "value date" of the wire transfer.  (ECF No. 1-4

at PageID 33.)

Before HYC made that payment, on December 26, 2023, Joseph Barnathan, while acting

on behalf of LP, allegedly agreed to enter into a settlement agreement with HYC ("Settlement

Agreement").  (ECF No. 1 at PageID 10.)  The same day, during a conference call with HYC,

Joseph Barnathan allegedly agreed to three things—to be liable for the debt, to sign the

Settlement Agreement, and to make payments under that agreement.  (*Id.*)  Likewise, HYC

asserts that each of the Barnathans agreed to guarantee LP's payment under the Settlement

Agreement.[1]  (*Id.*)

With its Complaint, HYC attached an unsigned, undated document entitled "Settlement

Agreement."  (ECF No. 1-5.)  HYC asserts that this document memorializes the Settlement

Agreement reached by HYC, LP, and the Barnathans.  (ECF No. 1 at PageID 10.)  According to

---

[1] As the Complaint states, "As part of the Settlement Agreement, HYC required, and each of the
Barnathan Defendants agreed to be, guarantors for the repayment obligation, jointly and
severally."  (ECF No. 1 at PageID 10.)

the written Settlement Agreement, LP agreed to pay HYC monthly installments totaling $1,238,288.00, starting in January 2024 and ending in March 2024. (ECF No. 1-5 at PageID 36.) That amount covers the money HYC paid to Detail Fashion on LP's behalf. (*Id.* at PageID 35.) It also includes $447,288.28 that LP still owed HYC under the Services Contract. (*Id.*) The Settlement Agreement also contains this guaranty provision ("Guaranty"): "In order to induce HYC to enter into this Agreement with LP, the Guarantors unconditionally guarantee the payment of all sums due under the Agreement on the part of LP … and agree to be jointly and severally liable for LP's payments and prompt performance under this Agreement." (*Id.* at PageID 37.) The Settlement Agreement lists the Barnathans as the guarantors. (*Id.* at PageID 35.)

HYC also alleges that "[o]n December 29, 2023, Counsel for LP emailed HYC stating that the Settlement Agreement was signed by LP and that LP and the Barnathan Defendants agreed to perform thereunder." (ECF No. 1 at PageID 10.) And Defendants allegedly made three installment payments under the Settlement Agreement. (*Id.* at PageID 10–11.) They paid $220,000.00 on December 28, 2023, $75,000.00 on January 22, 2024, and $70,000 on February 20, 2024. (*Id.*)

Despite making these payments, Defendants refused to provide ink-signed copies of the Settlement Agreement. (*Id.* at PageID 11.) HYC further asserts that, rather than turning over signed copies of the Settlement Agreement, Defendants tried to renegotiate the terms of the settlement. (*Id.*) In the end, Defendants defaulted under the Settlement Agreement and stopped making payments. (*Id.*) HYC asserts that, as of March 20, 2024, Defendants still owed HYC $952,780.16. (*Id.*)

The Court will now set out the relevant legal standard and then analyze the Barnathans'
Motion for Judgment on the Pleadings.

## LEGAL STANDARD

Under Rule 12(c), a party may move for judgment on the pleadings after the pleadings
close but "early enough not to delay trial." Fed. R. Civ. P. 12(c). When evaluating this type of
motion, courts "construe the complaint in the light most favorable to the plaintiffs, accept all of
the complaint's factual allegations as true, and decide whether the plaintiffs can prove any set of
facts in support of their claims that would entitle them to relief." *Lindsay v. Yates*, 498 F.3d 434,
438 (6th Cir. 2007).

Courts generally evaluate Rule 12(c) motions under the same standard as a motion to
dismiss under Rule 12(b)(6) for failure to state a claim. *Bates v. Green Farms Condo. Ass'n*, 958
F.3d 470, 480 (6th Cir. 2020); *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 608 (6th Cir.
2014). "To survive a motion to dismiss, a complaint must contain sufficient factual matter,
accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v Iqbal*, 556
U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts
accept all well-pleaded factual allegations as true, but they do not accept legal conclusions as
true. *Id.*

## ANALYSIS

### I.    Breach of Contract

The Barnathans argue that Count I of the Complaint, which contains HYC's breach of
contract claims, must fail because the Settlement Agreement, which contains the personal
Guaranty, does not satisfy the statute of frauds because it is not signed. HYC's response has two
parts. First, HYC argues that the Barnathans have breached and are liable under, not only the

Settlement Agreement, but also the Services Contract. (ECF No. 26 at PageID 156–57.) And

HYC points out that Joseph Barnathan signed the Services Contract without specifying that he

was signing on behalf of LP. (*Id.* at PageID 157.) Second, HYC argues that the statute of frauds

does not bar its breach of contract claims related to the Settlement Agreement and Guaranty. (*Id.*

at PageID 159.)

 The Court first assesses whether HYC has stated breach of contract claims against the

Barnathans based on the Services Contract and then addresses the arguments about the statute of

frauds.

 **A.**   **Services Contract**

 In relevant part, Count I states:

> 90.   HYC and LP entered into the Contract and are bound by its terms.

> 91.   HYC and LP entered into the Indemnity and are bound by its terms.

> 92.   HYC, LP, and the Barnathan Defendants entered into the Settlement Agreement and are bound by its terms.

> 93.   Each of the contracts required LP to pay HYC or to otherwise honor LP's debt obligations.

> 94.   HYC performed under every relevant contract.

> 95.   LP has failed to perform (or perform fully) under every relevant contract.

> 96.   The Barnathan Defendants failed to perform under the Settlement Agreement.

> 97.   As the legal and proximate result of the Defendants' breaches of the contracts, HYC has been damaged.

(ECF No. 1 at PageID 11–12.) In the Complaint, HYC also alleges, "[t]he Contract was signed

by Defendant J. Barnathan on behalf of LP." (*Id.* at PageID 4.)

Count I thus shows that, against the Barnathans, HYC has brought breach of contract claims based only on the Settlement Agreement. If HYC intended to bring breach of contract claims against the Barnathans based on the Services Contract, the Complaint does not make that clear or put the Barnathans on adequate notice of the claims. *See* Fed. R. Civ. P. 8 (requiring "a short and plain statement of the claim"). In fact, the Barnathans' Motion for Judgment on the Pleadings suggests that the Barnathans read the Complaint as asserting only breach of contract claims against them based on the Settlement Agreement, not also based on the Services Contract. (ECF No. 25-1 at PageID 137–39.) And the Court reads the Complaint the same way.

In Count I, HYC asserts that LP is bound under the Services Contract, but it does not make the same assertion about the Barnathans. (ECF No. 1 at PageID 11.) Moreover, in the Complaint, HYC asserts that J. Barnathan signed the Services Contract *on behalf of LP*—not also in his individual capacity as HYC now argues in its response to the Barnathans' Motion for Judgment on the Pleadings. (*Id.* at PageID 4.) What is more, Count I states that LP has failed to perform under *every* contract. (*Id.* at PageID 12.) But as to the Barnathans, the Complaint asserts only that they have failed to perform under the Settlement Agreement. (*Id.*) Accordingly, the Court finds that, against the Barnathans, HYC has only brought breach of contract claims arising out of the Settlement Agreement and Guaranty. [2]

The Court thus declines to address HYC's arguments about whether the Barnathans breached the Services Contract because, at present, HYC has not brought breach of contract claims against the Barnathans based on the Services Contract. *Bates v. Green Farms Condo.*

---

[2] Although HYC attached the Services Contract to the Complaint, the Court finds that this cannot by itself place the Barnathans on notice that HYC was suing them over that Contract. The Complaint does make clear that HYC is suing LP over the Services Contract, which, from this Court's view, explains why HYC attached the Services Contract to the Complaint.

*Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020) ("Plaintiffs cannot, by contrast, amend their complaint in an opposition brief or ask the court to consider new allegations (or evidence) not contained in the complaint.").

### B.    Settlement Agreement and the Guaranty

The Court now turns to the question of whether the Barnathans' Guaranty in the Settlement Agreement is enforceable.  The Barnathans contend it is not, raising the statute of frauds as a defense.  (ECF No. 25-1 at PageID 137.)  The Barnathans maintain that the Guaranty is subject to the statute of frauds, and that, since they did not sign the Guaranty, the statute of frauds bars this claim.  (*Id.*)  HYC counters that the Guaranty falls outside the statute of frauds. (ECF No. 26 at PageID 159.)  In the alternative, HYC argues that exceptions to the statute of frauds apply and so the Guaranty is enforceable.  (*Id.* at PageID 159–61.)  The Court now takes up these arguments.

Under Tennessee's statute of frauds,

No action shall be brought: … (2) To charge the defendant upon any special promise to answer for the debt, default, or miscarriage of another person; … unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person lawfully authorized by such party.

Tenn. Code Ann. § 29-2-101(a).  This means that, to be enforceable, a promise to answer for the debt of another must be in a signed writing or otherwise memorialized in a signed writing.  But, as HYC points out, there are exceptions to the statute of frauds.  And along with arguing the Guaranty here is not subject to the statute of frauds, HYC argues that the statute of frauds' exceptions apply here.

For three reasons, HYC maintains that the statute of frauds is inapplicable here.  HYC first argues that the Barnathans, not "another person," owe this debt and so the statute of frauds

does not apply.   (ECF No. 26 at PageID 159.)  As its second reason, HYC argues that

wrongdoers—the Barnathans—cannot rely on the statute of frauds as a defense.  (*Id.* at 159–61.)

And lastly, HYC argues that, because the parties have already partially performed under the

Settlement Agreement, the statute of frauds is no defense here.  (*Id.* at PageID 161.)

HYC's first argument is two-fold.  First, HYC argues that the Services Contract includes

LP's "principals" as parties to the Contract, so,  the Barnathans, as principals of LP, are already

liable for the debt under that Contract.  (ECF No. 26 at PageID 159.)  It follows, therefore, that

the Guaranty in the Settlement Agreement partially assures the Barnathans' own debt, meaning

the Guaranty is not subject to the statute of frauds.  (*See id.*)  Second, HYC argues that the

Barnathans admit that LP is liable to HYC under the Services Contract.  (*Id.*)  And so, because

the Barnathans manage, control, and operate LP, the debt that they guaranteed here is

"effectively" the Barnathans' own debt, making the statute of frauds inapplicable.  (*Id.*) The

Court reads this second argument as a contention that the main purpose rule takes the Guaranty

outside the statute of frauds here.[3]

### 1.    Debt of Another Person and Main Purpose Rule

In the context of a guaranty, for the statute of frauds to apply, the agreement must be to

pay the debt of another person.  As the Restatement (Second) of Contracts states:

> A contract that all or part of a duty of a third person to the promisee shall be satisfied
> is not within the Statute of Frauds as a promise to answer for the duty of another if
> the consideration for the promise is in fact or apparently desired by the promisor
> mainly for his own economic advantage, rather than in order to benefit the third
> person.

---

[3] Some courts call this the "leading object" rule.  *See Christian v. Smith*, 276 Neb. 867, 879
(2008).

Restatement (Second) of Contracts § 116 (1981). This is sometimes known as the main purpose rule. In sum, the Court finds that the main purpose rule applies here. In reaching this conclusion, the Court agrees with HYC that the Guaranty here is not within the statute of frauds because it is not a promise to answer for the debt of another. But, as seen in this Section, the Court uses slightly different reasoning than HYC.

The Tennessee state courts have not yet adopted the main purpose rule. But Judge Jon P. McCalla of this District Court concluded in a published opinion, that "a Tennessee court would adopt the main purpose exception to the statute of frauds in cases where the promisor has a business or pecuniary interest in guaranteeing the debt of a third party." *Wolff Ardis, P.C. v. Kimball Prods., Inc.* ("*Wolff Ardis*"), 289 F. Supp. 2d 937, 942 (W.D. Tenn. 2003). In reaching this conclusion, Judge McCalla reviewed court decisions from states other than Tennessee. *Id.* Judge McCalla's analysis shows that Ohio and Kentucky—states, like Tennessee, within the Sixth Circuit—have adopted the main purpose rule. *Id.* (citing *Barnett v. Stewart Lumber Company*, 547 S.W.2d 788, 790 (Ky. App. 1977); *Carl Meglan & Company v. Brumbaugh*, 1993 WL 531956 (Ohio App. Dec. 22, 1993)).

This Court agrees with Judge McCalla's analysis and the conclusion that Tennessee would adopt the main purpose rule. Indeed, the Court has not found a Tennessee state court decision since Judge McCalla's decision refuting the main purpose rule and state courts around the country continue to apply it. *See, e.g.*, *Willoughby Supply Co. v. Inghram*, 2015-Ohio-952, 30 N.E.3d 230, 236 ("Quite simply, the rule applies when the promisor obtains a personal business or pecuniary benefit by making the promise."). Likewise, other federal courts in Tennessee have since applied the main purpose rule. *See Neuro-Spine Sols., P.C. v. Freund*, No. 2:07-CV-82, 2010 WL 11520625, at *7 (E.D. Tenn. Mar. 17, 2010); *Johnson Marcraft, Inc. v.*

12

*W. Sur. Co.*, No. 3:15-1482, 2018 WL 1089685, at *1 (M.D. Tenn. Feb. 28, 2018), report and

recommendation adopted, No. 3:15-CV-01482, 2018 WL 3491219 (M.D. Tenn. July 19, 2018).

In *Wolff Ardis*, Judge McCalla found that the main purpose rule applied when a company

hired a law firm to collect an outstanding debt and the owner of the company had allegedly

guaranteed payment for services the law firm rendered.  289 F. Supp. 2d at 942.  As Judge

McCalla explained, "an officer and shareholder of a corporation cannot use the statute of frauds

as a shield when a law firm relies on his promise to represent the corporation."  *Id*.  He also

concluded that this is "particularly true" when "the individuals owned stock in closely held

corporations and controlled a significant amount, if not all, of the corporate stock."  *Id.*  In the

end, Judge McCalla found that, as an owner of the company, the owner had an interest in

pursuing the litigation and collecting debt owed to his company.  *Id.* at 943.  Accordingly, Judge

McCalla found the main purpose rule applicable.

While this case does not involve a law firm collecting debt for LP, it does involve HYC

putting off collecting the debt LP owes it under the Services Contract ($447,288.28) and bailing

LP out of its debt to Detail Fashion ($791,009.90).  Indeed, HYC paid Detail Fashion the balance

that LP owed Detail Fashion.  (ECF No. 1 at PageID 9.)  And under the alleged Settlement

Agreement, LP agreed to pay HYC both amounts and the Barnathans personally guaranteed that

repayment.  (ECF No. 1-5 at PageID 35–37.)

And so, with these facts, the Court finds *Wolff Ardis* persuasive and that the main purpose

rule applies here.  Indeed, while accepting all well-pleaded facts as true, the Court finds that the

main reason why the Barnathans allegedly agreed to the Guaranty was for their own economic

benefit.  Remember, each of the Barnathans is an officer, director, or executive of LP and,

collectively, they are either the majority or exclusive owners of LP.  (ECF No. 1 at PageID 4).

And just as the company's owner in *Wolff Ardis* had an interest in pursuing litigation and collecting debt owed to his company, the Court finds that LP's owners—the Barnathans—had an interest in having HYC pay off LP's debt to Detail Fashion.  The Court likewise finds that the Barnathans, as LP's majority or exclusive owners, had a personal economic interest in having HYC delay its collection of the amounts owed under the Services Contract.  And so their guarantee of the part of the Settlement Agreement that required LP to pay its remaining Services Contract debt to HYC benefitted them financially as well.

Accordingly, the Court finds, while accepting all factual allegations as true, that the main purpose rule applies here.  *See also Neuro-Spine Sols., P.C.*, 2010 WL 11520625, at *7 ("There is no evidence in the record to indicate that anyone other than [the defendant] was a majority owner of this corporation.  Accordingly, based upon the Second Restatement and the reasoning in *Wolff Ardis*, this Court concludes that the main purpose exception applies.").  The Court thus **DENIES** the Barnathans' Motion for Judgment on the Pleadings as to Count I.  HYC's breach of contract claims based on the Settlement Agreement and Guaranty may continue against the Barnathans.  Because the Court is allowing these claims to go forward, the Court need not address HYC's other arguments on why the statute of frauds does not apply here.  HYC may raise these other arguments again later if it sees fit.[4]

---

[4] As one of its arguments, HYC contends that the partial performance exception to the statute of frauds applies here.  But HYC has cited no cases applying the partial performance exception in the context of a guaranty and the Court likewise has not yet seen any Tennessee cases applying the exception in a case like this one.  The Court need not reach that issue in this Order.

**II.    Intentional Misrepresentation, Fraudulent Inducement, and Negligent Misrepresentation**

In Count II of the Complaint, HYC sues for "Fraud, Fraudulent Inducement, Intentional Misrepresentation, and/or Negligent Misrepresentation." (ECF No. 1 at PageID 13.) In Tennessee, "'intentional misrepresentation,' 'fraudulent misrepresentation,' and 'fraud' are different names for the same cause of action." *Hodge v. Craig*, 382 S.W.3d 325, 342 (Tenn. 2012). And the Tennessee Supreme Court "suggest[s]" that courts "exclusively" use the term "intentional misrepresentation." *Id.* at 343. Accordingly, the Court reads Count II as asserting claims for intentional misrepresentation, fraudulent inducement, and negligent misrepresentation.

Rule 9(b)'s pleading standard governs fraud claims like intentional misrepresentation and fraudulent inducement in federal court. *See Alsbrook v. Concorde Career Colls.*, Inc., 469 F. Supp. 3d 805, 843 (W.D. Tenn. 2020); *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 751 (6th Cir. 2014). Likewise, Rule 9(b) governs claims of negligent misrepresentation in federal court which arise under Tennessee law. *Thompson*, 773 F.3d at 751; *Harris v. Nationwide Mut. Fire Ins. Co.*, 367 F. Supp. 3d 768, 777–78 (M.D. Tenn. 2019) (collecting cases). This means that Rule 9 applies to HYC's claims in Count II.

That Rule requires that a complaint "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also Alsbrook*, 469 F. Supp. 3d at 843. "To plead a misrepresentation with particularity, a plaintiff 'must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Alsbrook*, 469 F. Supp. 3d at 843 (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008)). That said, "[m]istake, intent, knowledge, and conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

15

Each of the fraud theories here—intentional misrepresentation, fraudulent inducement, and negligent misrepresentation— "require that the defendant made a false statement of material fact that is designed to induce the plaintiff to rely on it." *Thompson*, 773 F.3d at 752. In other words, an element of each of these claims is that the defendant made a misrepresentation. *See id.*

Also relevant to this discussion is which fraud claims may be based on promises of future action, rather than statements of past or present facts. While "[a] negligent misrepresentation claim must be based on a misrepresentation about 'a material past or existing fact,'" *Alsbrook v. Concorde Career Colleges, Inc.*, 469 F. Supp. 3d 805, 832 (W.D. Tenn. 2020), two types of misrepresentations can serve as the basis of an intentional misrepresentation claim. *See Brown v. Woodbury Auto Grp. LLC*, 591 F. Supp. 3d 282, 294 (M.D. Tenn. 2022). Indeed an intentional misrepresentation claim may be based on (1) a misrepresentation of an "existing or past fact" or (2) a promise made without "the present intention to carry out the promise." *Brown*, 591 F. Supp. 3d at 294.

When a plaintiff brings an intentional misrepresentation claim based on a promise of future action, they rely on a promissory fraud theory.[5] *City of Morristown v. AT&T Corp.*, 206 F. Supp. 3d 1321, 1332 (E.D. Tenn. 2016) ("Under this doctrine, a future promise can support a

---

[5] Some federal courts in Tennessee treat promissory fraud as a separate claim from an intentional misrepresentation claim, while others treat promissory fraud as a theory under which to allege an intentional misrepresentation claim. *Compare Monaco Indus., LLC v. Fomento Econ. Mexicano S.A.B. de C.V.*, 685 F. Supp. 3d 654, 672 (E.D. Tenn. 2023), *with Power & Tel. Supply Co. v. SunTrust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006), *Brown v. Woodbury Auto Grp. LLC*, 591 F. Supp. 3d 282, 294 (M.D. Tenn. 2022), *and City of Morristown v. AT&T Corp.*, 206 F. Supp. 3d 1321, 1332 (E.D. Tenn. 2016). And some courts treat promissory fraud and fraudulent inducement as the same claim, while others do not. *Compare Power & Tel. Supply Co.*, 447 F.3d at 931, *with Omorfia Ventures, Inc. v. Posh Bridal Couture, LLC*, No. 3:19-CV-00794, 2020 WL 5500483, at *6 (M.D. Tenn. Sept. 11, 2020) (citation omitted). The Tennessee Supreme Court has not clarified these issues. The Parties and the Court can address the best way to view these claims at later stages in the litigation.

claim for intentional misrepresentation if it was made with the intent not to perform." (citation

omitted)).  Likewise, a fraudulent inducement claim "may be based on false statements of past or

present facts or false promises made without the present intent to perform." *Omorfia Ventures,*

*Inc. v. Posh Bridal Couture, LLC*, No. 3:19-CV-00794, 2020 WL 5500483, at *6 (M.D. Tenn.

Sept. 11, 2020) (citation omitted).

Whether HYC has sufficiently pleaded that the Barnathans made misrepresentations is

central to the Barnathans' arguments on the Count II claims.  And it is also the element that the

Court focuses on in this Order.  Indeed, the Barnathans make a single argument for why the

Court should dismiss the claims in Count II.  According to the Barnathans, HYC alleges only

that *LP* misrepresented facts, meaning HYC fails to allege with the required Rule 9 particularity

that the *Barnathans* misrepresented facts in their individual capacities.  (ECF No. 25-1 at PageID

141.)  And so, the Barnathans maintain that the Court must dismiss the Count II claims against

them for failure to state a claim.  (*Id.*)

The Court finds that HYC has pleaded some, but not all, of the alleged misrepresentations

with enough particularity under Rule 9.  As the Court reads the Complaint, HYC alleges its

Count II claims over two sets of misrepresentations: (1) misrepresentations surrounding the

Settlement Agreement and Guaranty and (2) misrepresentations surrounding LP's financial

condition and the Services Contract.  For the reasons explained next, the Court finds that the

HYC's intentional misrepresentation claims stemming from the alleged misrepresentations

related to the Settlement Agreement and Guaranty may continue under a promissory fraud

theory.  Likewise, the fraudulent inducement claims related to the alleged misrepresentations

about the Settlement Agreement and Guaranty may continue.  But HYC's negligent

17

misrepresentation claims and all of HYC's Count II claims based on the alleged

misrepresentations about the Services Contract and LP's financial condition fail.

### A.    Misrepresentations: The Settlement Agreement and Guaranty

Contrary to the Barnathans' assertions, HYC does allege that the Barnathans made

misrepresentations.  In fact, the Complaint includes these allegations:

> 78.    On December 26, 2023, Defendant J. Barnathan held a conference call with HYC and its legal counsel wherein he agreed to liability for the debt, agreed to sign the Settlement Agreement and to timely make the payments required thereunder.
>
> 79.    On December 29, 2023, Counsel for LP emailed HYC stating that the Settlement Agreement was signed by LP and that LP and the Barnathan Defendants agreed to perform thereunder.

(ECF No. 1 at PageID 10.)  And in Count II, the Complaint asserts that the Barnathans made

other misrepresentations.  For example:

> 106.    LP, and the Barnathan Defendants—both individually and collectively—made repeated representations to HYC in order to induce HYC to act.
>
> 112.    And after HYC released the goods to LP and paid LP's debts, the Defendants promised they would pay HYC back in full if HYC would forebear on taking legal action – a promise Defendants had no intention of honoring when the promise was made.
>
> 113.    HYC repeatedly relied on Defendants' false statements and promises, and HYC repeatedly took action based on those same false statements and representations.
>
> 114.    The Defendants' repeated false statements and promises have damaged HYC.

(ECF No. 1 at PageID 13.)

As these paragraphs from the Complaint show, HYC alleges that the Barnathans made

misrepresentations about the Settlement Agreement and Guaranty.  It is evident to the Court that

HYC's allegations boil down to this simple point: the Barnathans represented that they would

perform under the Settlement Agreement and Guaranty and pay HYC the money it is owed under the Settlement Agreement, but they never intended to do so.

And the Court finds that HYC's allegations about these alleged misrepresentations satisfy Rule 9. Indeed, HYC describes specific statements in which the Barnathans assured HYC that they would perform under the Settlement Agreement—including one statement made by Joseph Barnathan and one made by LP's lawyer,[6] presumably on the Barnathans' behalf.[7] (ECF No. 1 ¶¶ 78, 79.) And the allegations here include the detail Rule 9 requires—including who made the statements, when the statements were made, the content of the statements, and the form of the statements. Accordingly, the Court finds unpersuasive the Barnathans' position that HYC failed to allege with enough specificity that the Barnathans made misrepresentations.

The Court thus **DENIES** the Barnathans' Motion for Judgment on the Pleadings on HYC's intentional misrepresentation and fraudulent inducement claims based on the alleged misrepresentations over the Settlement Agreement and Guaranty.[8] That said, the Court **GRANTS** the Barnathans' Motion for Judgment on the Pleadings as it relates to alleged negligent misrepresentations arising out of these statements. This is because the Barnathans'

---

[6] The Tennessee Supreme Court has adopted Section 533 of the Restatement (Second) of Torts which states:

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.

See *Davis v. McGuigan*, 325 S.W.3d 149, 159 (Tenn. 2010).

[7] When reading the Complaint as a whole, it was evident to the Court that HYC alleges that these statements were misrepresentations. That said, HYC could have better denoted in the Complaint the precise statements that they contend were misrepresentations.

[8] The intentional misrepresentation claims continue under a promissory fraud theory.

representations about the Settlement Agreement and Guaranty relate to promises of future action,
not statements about present or past facts.

As seen above, the Court has assessed only whether HYC alleged that the Barnathans
made misrepresentations with enough detail.  The Court did not otherwise analyze whether HYC
stated legally viable claims here or look at the other elements—like justified reliance.  This is
because the Barnathans' only developed argument in their Motion is that HYC fails to allege that
the Barnathans, in their individual capacities, made misrepresentations.  (*See* ECF No. 25-1 at
PageID 141.)  Indeed, besides making broad statements about some of the other elements, the
Barnathans made no other arguments about the legal viability of the Count II claims, and the
Court declines to come up with arguments for them.

### B.    Misrepresentations: Services Contract and LP's Financial Condition

HYC also alleges that the Barnathans made misrepresentations about LP's financial
condition and LP's ability and willingness to perform under the Services Contract.  (ECF No. 1
at PageID 13.)  The Court finds that HYC has not pleaded these alleged misrepresentations with
enough particularity to satisfy Rule 9.  In relevant part, the Complaint states:

> 106.    LP, and the Barnathan Defendants —both individually and collectively—
> made repeated representations to HYC in order to induce HYC to act.
>
> 107.    Through both telephone and email, the Defendants represented they were
> an established business concern with plenty of liquidity to honor their obligations.
>
> 108.    LP, by and through the Barnathans, represented to HYC that LP had the
> ability to pay for the services to be rendered under the initial Contract.
>
> 109.    Of course, LP entered into that Contract at precisely the same time it was
> delinquent with other service providers and vendors, and during the same time it
> was in active litigation with other service providers and vendors for precisely the
> same conduct alleged here.
>
> 110.    As other contemporaneous lawsuits make clear, LP has a clearly established

practice of ordering goods from overseas, arranging their import into the United States, taking delivery of the goods, and then selling the goods while not paying anyone in the commercial chain for the services they provided LP.

111.    LP never had any intention of honoring its payment agreement.

113.    HYC repeatedly relied on Defendants' false statements and promises, and HYC repeatedly took action based on those same false statements and representations.

114.    The Defendants' repeated false statements and promises have damaged HYC.

(ECF No. 1 at PageID 13–14.)

HYC has failed to allege who made these alleged misrepresentations.[9]  For example, although there are four Defendants in this case, HYC broadly groups them together and writes: "Through both telephone and email, the Defendants represented they were an established business concern with plenty of liquidity to honor their obligations."  (*Id.*); *see U.S., ex rel. Branhan v. Mercy Health Sys. of Sw. Ohio*, 188 F.3d 510 (6th Cir. 1999) (explaining in a case with five defendants that the complaint did not comply with Rule 9 when the allegations were "based on generalized accusations of wrongdoing attributed to 'defendants' without any specificity as to which employees of the defendants were engaged in the alleged fraudulent scheme."); *Triumph Hosp., LLC v. Constr. Mgmt., Inc.*, No. 3:19-CV-00353, 2019 WL 3841942, at *6 (M.D. Tenn. Aug. 15, 2019) ("[W]hen a plaintiff pursues fraud claims against multiple defendants, it must make "specific allegations as to each defendant's alleged involvement."). And HYC does not clarify who made the statements here in the other paragraphs or areas of the Complaint.  (*See generally* ECF No. 1.)

_____

[9] The Court finds the Barnathans' precise argument—that HYC alleged only that the Barnathans made misrepresentations on behalf of LP instead of in their individual capacity—unpersuasive. That said, the Court does find that HYC has not sufficiently detailed the speaker of the alleged misrepresentations.

What is more, besides failing to specify the speaker of these statements, the Complaint also lacks enough detail about when and where these alleged misrepresentations happened. Accordingly, the Court finds that HYC has failed to satisfy Rule 9 with these allegations. *See Kattawar v. Logistics & Distribution Servs., Inc.*, No. 14-2701-STA-CGC, 2015 WL 508011, at *9 (W.D. Tenn. Feb. 6, 2015).

The Court thus **GRANTS** the Barnathans' Motion for Judgment on the Pleadings on the Count II claims based on the alleged misrepresentations the Barnathans made about LP's ability and willingness to pay under the Services Contract and LP's overall financial condition.

## III.    Unjust Enrichment and Quantum Meruit

As an alternate theory, HYC brought claims for unjust enrichment and quantum meruit against the Barnathans.[10]  (ECF No. 1 at PageID 14.)  The Parties argue about whether HYC has stated claims against the Barnathans for quantum meruit.  (ECF No. 25-1 at PageID 142; ECF No. 26 at PageID 165.)  But, when looking at the elements of quantum meruit and unjust enrichment claims, the Parties seem to be arguing about whether HYC has stated an unjust enrichment claim against the Barnathans.

At the core of the Parties' dispute on this claim is whether HYC has alleged that it conferred a benefit on the Barnathans, rather than on LP alone.  (ECF No. 25-1 at PageID 143; ECF No. 26 at PageID 165.)  As the Barnathans argue, "Plaintiff's Complaint fails to articulate genuine facts to explain how, when, or under what circumstances a benefit to LP—a presumptively unique legal entity—constitutes a benefit to any of the Barnathan Defendants personally."  (ECF No. 25-1 at PageID 143 (emphasis removed)).  In response, HYC argues that

---

[10] Although HYC brought breach of contract claims against the Barnathans, HYC may bring claims for quantum meruit and unjust enrichment in the alternate for now.

the Barnathans are LP's sole owners and reap the benefits that LP reaps. (ECF No. 26 at PageID 165.) Like the "main purpose rule" discussed above, HYC argues that it conferred a benefit on the Barnathans when it paid LP's debt to Detail Fashion. (ECF No. 26 at PageID 166.)

"Under an unjust enrichment theory, courts impose a contractual obligation where there is 'no contract between the parties or the contract has become unenforceable or invalid,' and the defendant will be unjustly enriched unless the court imposes a quasi-contractual obligation." *Fam. Tr. Servs. LLC v. Green Wise Homes LLC*, 693 S.W.3d 284, 304–05 (Tenn. 2024) (citing *Whitehaven Cmty. Baptist* Church, 973 S.W.2d at 596). An unjust enrichment claim has three elements: (1) "[a] benefit conferred upon the defendant by the plaintiff," (2) "appreciation by the defendant of such benefit," and (3) "acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Id.* (citing *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005)). "The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust." *Id.* (*Freeman Indus., LLC*, 172 S.W.3d at 525).

It has been said that quantum meruit and unjust enrichment are "essentially the same." *Id.* (citing *Paschall's Inc. v. Dozier*, 407 S.W.2d 150, 154 (1966)). But the Tennessee Supreme Court has recently clarified that the claims are indeed different and contain different elements. *See id.* To state a quantum meruit claim under Tennessee law, a plaintiff must plead:

(1) There is no existing, enforceable contract between the parties covering the same subject matter;

(2) The party seeking recovery proves that it provided valuable goods or services;

(3) The party to be charged received the goods or services;

(4) The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and

    (5) The circumstances demonstrate that it would be unjust for a party to retain the
        goods or services without payment.

*Doe v. HCA Health Servs. of Tennessee, Inc.*, 46 S.W.3d 191, 198 (Tenn. 2001) (citing *Swafford*

*v. Harris*, 967 S.W.2d 319, 324 (Tenn.1998)).

      The Court finds that HYC has stated claims for unjust enrichment against the Barnathans.

As the Tennessee Supreme Court has stated, "a plaintiff need not establish that the defendant

received a direct benefit from the plaintiff." *Freeman Indus., LLC v. Eastman Chem. Co.*, 172

S.W.3d 512, 525 (Tenn. 2005).  In fact, "a plaintiff may recover for unjust enrichment against a

defendant who receives *any* benefit from the plaintiff if the defendant's retention of the benefit

would be unjust." *Id.* (emphasis added).

      With this in mind, the Court finds that HYC has plausibly stated a claim of unjust

enrichment against the Barnathans.  HYC paid a good deal of money to Detail Fashion for LP.

And the Barnathans are LP's majority or exclusive owners.  (ECF No. 1 at PageID 4.)  Likewise,

each of the Barnathans serves as an officer, director, or executive of LP.  (*Id.*)  And so,

considering the facts in the light most favorable to HYC, the Court finds it plausible that the

Barnathans received at least an indirect benefit from HYC's actions.  *See Jones v. Varsity*

*Brands, LLC*, 618 F. Supp. 3d 725, 769 (W.D. Tenn. 2022) ("Even if [Varsity's CEO] reaped his

benefits from the anticompetitive scheme by being paid by Varsity, that still qualifies as

involving benefits conferred by a third party onto [the CEO].").

      Accordingly, while construing the Complaint in the light most favorable to HYC, the

Court **DENIES** the Barnathans' Motion for Judgment on the Pleadings on HYC's unjust

enrichment claims.[11]  Since the Barnathans did not argue about the quantum meruit elements, the

Court also **DENIES** the Barnathans' Motion for Judgment on the Pleadings on HYC's quantum

meruit claims.  And so, for now, the unjust enrichment and quantum meruit claims may continue.

## IV.    Sworn Account

In Count IV of the Complaint, HYC brought sworn account claims against the

Barnathans.  (ECF No. 1 at PageID 14–15.)  And the Barnathans moved for judgment on the

pleadings on those claims.  (ECF No. 25-1 at PageID 144.)  The Barnathans argue that "Plaintiff

fails to allege facts to support the existence of an open account between Plaintiff and the

Barnathan Defendants, rather than between Plaintiff and LP."  (ECF No. 25-1 at PageID 144.)  In

its response, HYC did not address the sworn account claims.  (ECF No. 26.)

The Court finds the Barnathans' position well-taken.  The Court notes that the sworn

account claim relates to the Services Contract, not the Settlement Agreement.  And the

Complaint alleges that an open account existed between HYC and LP only.[12]  As HYC alleges,

"Under the Contract, HYC provided services to LP on account which LP agreed to promptly pay

upon receipt of HYC's monthly invoice."  (ECF No. 1 at PageID 4.)  The Court thus **GRANTS**

judgment on the pleadings in favor of the Barnathan Defendants on Count IV of the Complaint

based on the sworn account.  This claim as to LP will proceed.

---

[11] As explained above, although the Barnathans use the term "quantum meruit" in their Motion,
the Court views their arguments here to be about the unjust enrichment claims.

[12] The specific factual allegations suggest that the open account was between only HYC and LP
and that LP, not the Barnathans, owe HYC under the Services Contract.  (ECF No. 1 at PageID
4, 8–9.)  That said, HYC does more broadly allege under Count IV (the Sworn Account Count)
that HYC provided services to "Defendants" on an open account basis.  (ECF No. 1 ¶ 124.)  In
their Answer, Defendants admitted this allegation.  (ECF No. 15 ¶ 124.)  In any event, HYC has
not responded to the Barnathans' Motion on this point and, when looking at the more precise
factual allegations, HYC alleges there was only an account open between LP and HYC.  (ECF
No. 1 at PageID 4.)

## V.    Declaratory Judgment

In Count V, HYC seeks a declaratory judgment that "LP's corporate veil should be pierced so as to assert liability directly against the Barnathan Defendants." (ECF No. 1 at PageID 15.)  In this vein, HYC alleges, "[t]he corporate form is a sham or mere instrumentality, and the Barnathan Defendants have failed to observe all necessary corporate formalities, intermingled funds, and used LP as their own personal piggy bank." (*Id.*)  The Barnathans move for judgment on the pleadings on HYC's claim here and argue that this allegation is a mere legal conclusion. (ECF No. 25-1 at PageID 142–44.)  HYC responds and argues that this claim should survive, because it has "sufficiently pled that the Barnathan Defendants have used LP to convert funds of HYC by fraud and inducement." (ECF No. 26 at PageID 166.)

As the Tennessee Supreme Court recently held, a claim to pierce the corporate veil has three elements:

(1) Control over the entity, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the entity, as to that transaction, had no separate mind, will, or existence of its own;

(2) The control must have been used to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or to commit a dishonest and unjust act in contravention of a third party's rights; and

(3) The control and fraud, wrong, violation, or injustice must have proximately caused the injury or unjust loss complained of.

*Youree v. Recovery House of E. Tennessee*, LLC, 705 S.W.3d 193, 211 (Tenn. 2025) (citing

*Continental Bankers Life Insurance Co. of the South v. Bank of Alamo* ("*Continental Bankers*"),

578 S.W.2d 632 (Tenn. 1979)).

When deciding whether the three elements have been alleged, courts may look to the

eleven *Allen* factors. *Id.*; *see Fed. Deposit Ins. Corp. v. Allen*, 584 F. Supp. 386, 397 (E.D. Tenn.

1984). These factors are:

> (1) whether there was a failure to collect paid in capital; (2) whether the corporation
> was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole
> ownership of stock by one individual; (5) the use of the same office or business
> location; (6) the employment of the same employees or attorneys; (7) the use of the
> corporation as an instrumentality or business conduit for an individual or another
> corporation; (8) the diversion of corporate assets by or to a stockholder or other
> entity to the detriment of creditors, or the manipulation of assets and liabilities in
> another; (9) the use of the corporation as a subterfuge in illegal transactions; (10)
> the formation and use of the corporation to transfer to it the existing liability of
> another person or entity; and (11) the failure to maintain arms length relationships
> among related entities.

See *Allen*, 584 F. Supp. at 397. Lastly, the Court is mindful that there is a "presumption of

corporate separateness" and that piercing the corporate veil is "the exception, not the rule."

*Youree*, 705 S.W.3d at 211 (citing *Edmunds v. Delta Partners*, L.L.C., 403 S.W.3d 812, 829

(Tenn. Ct. App. 2012)).

This Court finds that HYC has alleged enough facts to survive the Barnathans' Motion

for Judgment on the Pleadings on its veil-piercing claim. Indeed, as explained below, the Court

finds that HYC has sufficiently pleaded that the Barnathans controlled LP with respect to the

transactions at issue, used the control to commit fraud in relation to the Settlement Agreement

and Guaranty, and that HYC was injured as a result.

Although the issue is a close call, the Court finds that, reading the Complaint in the light

most favorable to HYC, HYC has alleged that the Barnathans exert the type of control over LP

necessary to satisfy prong one of the *Continental Bankers* test. Indeed, HYC alleges that the

Barnathans "are the majority, if not exclusive, owners of LP and both control and operate LP."[13]

---

[13] One court has held that the first prong of the Continental Bankers test was met

(ECF No. 1 ¶ 22.)  And the Barnathans have admitted this allegation.  (ECF No. 15 ¶ 22.)

Likewise, each of the Barnathans serve as an executive, officer, or director of LP.  (ECF No. 1 at

PageID 4.)  What is more, the Complaint suggests that the lawyer involved in the main

transaction at issue—the Settlement Agreement—represented both LP and the Barnathans in the

transaction.  (ECF No. 1 at PageID 10.)

As for the second and third prongs of the *Continental Bankers* test, the Court finds that

HYC's factual allegations allow for the inference that the Barnathans used their control over LP

and its corporate form to commit a fraud or unjust act, resulting in HYC's injury.  Indeed, the

Complaint suggests that the Barnathans lured HYC into paying off LP's debt with the promise of

a personal guaranty.  Then, after HYC paid Detail Fashion $791,009.90, the Barnathans refused

to produce signed copies of the Guaranty and instead tried to renegotiate its terms.  LP has since

defaulted under the Settlement Agreement, leaving HYC unpaid.  The Court finds that is a

plausible claim that the Barnathans used the corporate form to commit a fraud.  *See Edmunds v.*

*Delta Partners*, L.L.C., 403 S.W.3d 812, 831 (Tenn. Ct. App. 2012) (collecting cases) ("[S]ome

courts have pierced the corporate veil when the shareholder exercising control over the

corporation made personal assurances that a debt would be paid.").

---

when "the proof at trial showed that [the sole shareholder] exercised complete dominion and
control over [the company] during the years at issue in this case" and the sole shareholder
admitted that the company "was 'essentially' him from 2006 until the time of trial."  *Edmunds v.*
*Delta Partners, L.L.C.*, 403 S.W.3d 812, 830 (Tenn. Ct. App. 2012).  In reaching this conclusion
the *Edmunds* court cited *Stark v. Coker*, 20 Cal.2d 839, 129 P.2d 390 (1942) and noted that, in
*Stark*, the Court considered "in a veil piercing case, evidence that the married couple who
controlled the corporation stated that they were the corporation." *Edmunds*, 403 S.W.3d at 830.
While there is not an allegation that LP was essentially the Barnathans, the Court finds that,
while reading the Complaint in the light most favorable to HYC and drawing all reasonable
inferences in favor of HYC, there is enough for the claim to continue.

Accordingly, the Court finds that, given these facts as alleged, HYC has pleaded enough to state a veil-piercing claim. The Court thus **DENIES** the Barnathans' Motion for Judgment on the Pleadings on that claim.

## CONCLUSION

For the reasons explained above, the Court **GRANTS IN PART** and **DENIES IN PART** the Barnathans' Motion for Judgment on the Pleadings. The Court **GRANTS** the Barnathans' Motion on these claims: (1) the negligent misrepresentation claims; (2) the intentional misrepresentation and fraudulent inducement claims based on the alleged misrepresentations the Barnathans made about LP's ability and willingness to pay under the Services Contract and LP's financial condition more broadly; and (3) the sworn account claims. The Court **DENIES** the Barnathans' Motion on the remaining claims.

To be clear, this means that these claims against the Barnathans survive the Motion and may continue: (1) the breach of contract claims based on the Settlement Agreement and Guaranty; (2) the fraudulent inducement claims based on the alleged misrepresentations about the Barnathans' agreement to perform under the Settlement Agreement and Guaranty; (3) the intentional misrepresentation claims based on the alleged misrepresentations about the Barnathans' agreement to perform under the Settlement Agreement and Guaranty under a promissory fraud theory; (4) the quantum meruit and unjust enrichment claims; and (5) the veil-piercing claims.

**SO ORDERED**, this 14th day of May, 2025.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE